WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard W. Slack
Robert J. Lemons
Lauren Hoelzer Helenek

Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>Debtor. | Chapter 11 Case<br>No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc. and<br>Lehman Brothers Special Financing Inc.<br><br>      Plaintiffs,<br><br>v.<br><br>Giants Stadium  LLC<br><br>      Defendant. | Adv. Proc. No. 13-_____<br><br>**ADVERSARY**<br>**PROCEEDING**<br>**COMPLAINT** |

Plaintiffs Lehman Brothers Holdings Inc. ("LBHI"), on behalf of itself and in its capacity

as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman

Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), and Lehman Brothers Special

Financing Inc. ("LBSF," and with LBHI, "Lehman"), by their undersigned attorneys, allege the

following on knowledge as to themselves and their own acts and upon information and belief as

to all other matters against defendant Giants Stadium LLC ("Giants Stadium"):

## PRELIMINARY STATEMENT

1.      Lehman brings this action seeking to recover over $100 million owed to LBSF as

a result of Giants Stadium's failure to pay amounts due upon the early termination of two

interest-rate swap transactions (the "Swaps") that were intended to hedge interest rate risk on

bonds (the "Bonds") issued by Giants Stadium and underwritten by Lehman Brothers, Inc.

("LBI").  At the time that it terminated the Swaps in September 2008, Giants Stadium knew that

LBSF was the "in-the-money" party and that, upon termination of the Swaps, Giants Stadium

would be contractually obligated to pay LBSF tens of millions of dollars under the Swaps.

Rather than pay LBSF any amount, however, Giants Stadium undertook a contorted plan

intended to transform a significant receivable by LBSF into a huge payable by LBSF and LBHI.

2.      Immediately following LBHI's chapter 11 filing, Giants Stadium took

extraordinary steps to terminate the Swaps in a manner that subverted LBSF's bargained-for

contractual rights, enabling it to assert (wrongly) that LBSF and LBHI owed hundreds of

millions of dollars to Giants Stadium under the Swaps.  At the center of Giants Stadium's

strategy was its own accurate and expressed concern that once LBI resigned as broker-dealer for

the Bonds (which Giants Stadium believed to be and was, in fact, imminent), the floating interest

rate on the Swaps would switch from the interest rate on the Bonds to a LIBOR-based rate that

favored LBSF.  In an attempt to avoid the switch to a LIBOR-based rate, Giants Stadium

hurriedly sought to terminate the Swaps on September 18, 2008—one day before LBI was placed in liquidation proceedings—while LBI was still the broker-dealer for the Bonds. Giants Stadium hoped (again, wrongly) that doing so would allow it to calculate a termination payment based on hypothetical future auctions on the Bonds. But Giants Stadium's drastic actions to avoid the LIBOR-based rate were in vain: the confirmations to the ISDA Master Agreements (the "Confirmations") specifically provided for a LIBOR-based calculation of termination payments. Moreover, the interest rate on the Bonds (and therefore the rate LBSF was paying to Giants Stadium on the Swaps) already was LIBOR-based by the time of termination because the Bonds were being held rather than auctioned.

3.      Giants Stadium's acknowledgement of any one of the provisions in the transaction documents that required application of a LIBOR-based rate would have generated a receivable to LBSF. In an attempt to prevent that result, Giants Stadium:

(a) ignored various critical bargained-for LBSF rights created by the plain terms of the transaction documents, including, but not limited to, LBSF's right (i) to be informed of and consent to any amendment of the indenture to the Bonds and (ii) to select and solicit bids from financial institutions under the "Market Quotation" measure upon any early termination of the Swaps;

(b) attempted to apply a prohibited *ipso facto* provision in the Confirmations (described below, the "*ipso facto* clause") that improperly modifies the methodology for calculating a termination payment in the case of a bankruptcy filing by Lehman from a LIBOR-based calculation—under which Giants Stadium would have been required to pay LBSF approximately $94 million, plus interest—to a modified Market Quotation calculation;

2

(c) ignored then-current facts vital to valuing the Swaps, such as (i) the impending termination and replacement of LBI as broker-dealer for the Bonds and (ii) the fact that LBSF was paying a LIBOR-based floating rate on the Swaps, not an interest rate generated by auctions of the Bonds, at the time of termination; and

(d) in calculating an early termination payment, made erroneous, unreasonable, and inconsistent assumptions about future facts that impacted such calculations and circumscribed LBSF's exposure with respect to the Swaps, such as assuming that auction rates generated just after the LBHI bankruptcy filing would continue for the thirty-eight years remaining on the Swaps and that LBSF, or any counterparty standing in LBSF's shoes, would not at some point exercise its explicit and unambiguous right under the Swaps to cause a refinancing of the Bonds.

4.      The Swaps were an integral part of a project financing transaction to finance the construction of the New Meadowlands Stadium (the "Stadium") in East Rutherford, New Jersey. The owners of the New York Giants football club created Giants Stadium as a limited liability corporation for their portion of the project financing and construction of the Stadium.  As part of this project financing, Giant Stadium issued approximately $650 million of project financing bonds.  These bonds ("ARS") initially were issued in the form of auction rate securities.  Auction rate securities are debt instruments with a long-term notional maturity for which the interest rate is reset on a regular basis by means of periodic auctions, usually monthly.  $408 million of the ARS were underwritten by LBI (i.e., the Bonds).  The remaining ARS (the "Goldman Bonds") were underwritten by Goldman, Sachs & Co. ("Goldman").

5.      Giants Stadium entered into the Swaps in order to hedge its interest rate risks associated with the Bonds.  The Swaps were subject to two separate 1992 form ISDA Master

US_ACTIVE:\44290157\15\58399.0011

Agreements (the "Master Agreements") and the Schedules and annexes thereto, and the Confirmations thereunder (along with the Master Agreements and Schedules, the "Agreements"). Under the Agreements, LBSF agreed to pay Giants Stadium a floating rate known as the "Actual Bond Rate"—an amount that was identical to the interest rate set on the Bonds—in return for which Giants Stadium agreed to pay LBSF interest at a fixed rate of 6.1885%. Thus, Giants Stadium was able to establish a hedge for its obligations under the Bonds (and associated expenses). To mitigate the additional risk that paying a floating rate based on the actual auction rates imposed, LBSF bargained for and obtained critical protections. These included the explicit and unambiguous right to have Giants Stadium refinance the Bonds at LBSF's request. This ensured that LBSF would never be exposed to long-term dislocations in the auction rate securities market and thus acted as a structural cap on any loss that LBSF could suffer under the Swaps. The critical protections also included the right to have a Lehman affiliate—in this case, LBI—act as broker-dealer in connection with the Bonds, thereby ensuring control over the process by which LBSF's interest payments were set. The Agreements explicitly and unambiguously required that if LBI ever was "terminated or replaced" as broker-dealer, the floating rate automatically would switch to a market-based LIBOR rate unrelated to the Actual Bond Rate (thus converting the Swaps to "plain vanilla" interest rate swaps). In other words, LBSF negotiated to be in a position where it would never have to pay the Actual Bond Rate on the Swaps unless LBI controlled the process of setting the Actual Bond Rate. These protections were among the many for which LBSF specifically bargained, but which Giants Stadium ultimately and unilaterally disregarded in calculating termination payments under the Swaps.

6.    Paragraph 5 of the relevant Confirmations, which governed the calculation of payments upon any early termination of the Swaps, provided that in the event that the Swaps

4

were terminated, the "Settlement Amounts" (the payment owing upon early termination under

the Agreements, whether calculated using the Market Quotation or Loss measure) would be

calculated as if the floating rate was a LIBOR-based rate, rather than the Actual Bond Rate. An

exception existed for a termination based on a Lehman bankruptcy filing: in such a case, the

Settlement Amounts would be calculated pursuant to Paragraph 6 of the Confirmations using a

modified Market Quotation process. Because that exception modifies LBSF's rights as a result

of a bankruptcy filing, however, it is an *ipso facto* clause under sections 365(e)(1)(B) and

541(c)(1)(B) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that

cannot be enforced against LBSF.

7.    Apart from *ipso facto* clause considerations and assuming *arguendo* that the

modified Market Quotation process set forth in Paragraph 6 applied, that modified Market

Quotation process also provided LBSF with significant rights intended to ensure that the Market

Quotation measure would be applied properly. The parties agreed that even in a situation in

which LBSF was the "Defaulting Party," LBSF and Giants Stadium each would select two

financial institutions ("Reference Market-makers") from whom to solicit Market Quotations and

**LBSF** (not Giants Stadium) would perform the solicitation and thereby determine the value of

the Swaps. This differed from the typical Market Quotation process in which the "Non-

defaulting Party" selects the four Reference Market-makers and solicits quotations from them.

The modified Market Quotation process the parties selected was intended to prevent the very

type of manipulation of the calculation of the Settlement Amounts that Giants Stadium

performed here by giving LBSF the opportunity to educate the Reference Market-makers about

the highly-customized terms of the Swaps to be valued. This protection, too, was among the

5

many for which LBSF specifically bargained, but which Giants Stadium ultimately and unilaterally disregarded.

8.      Another protection LBSF obtained with respect to the Swaps prohibited an early termination of the Swaps if such termination would violate the so-called "minimum hedging requirement" expressly set forth in the indenture to the ARS (the "Indenture"), pursuant to which a specified amount of the Bonds had to be hedged at all times. The Indenture explicitly required LBSF to consent to any amendment of the Indenture that materially and adversely affected its rights. The amendment of the Indenture to remove the minimum hedging requirement materially and adversely affected LBSF's rights as it effectively rendered illusory the provisions in the Swaps that prohibited termination of the Swaps by Giants Stadium if the minimum hedging requirement was not met.

9.      In the period leading up to September 15, 2008, when LBHI filed its chapter 11 petition, the auction rate market had collapsed and many auctions had failed. Thus, pursuant to the Agreements, LBI had ceased to auction the Bonds periodically, and instead, purchased all of the Bonds for its own account. As a result, under the Agreements, the floating rate to be paid by LBSF became 90% of one-month LIBOR (i.e., the "All Hold Rate"), a rate that favored LBSF.

10.     LBSF had been generating regular valuations of the Swaps and had sent one such statement to Giants Stadium in early September 2008, which showed the Swaps to be approximately $60 million in LBSF's favor at that time. Giants Stadium never questioned the accuracy of the $60 million valuation. Facing the prospect of having to pay LBSF a significant sum upon the termination of the Swaps, Giants Stadium desperately sought to restack the deck by manipulating the termination process to attempt to turn a significant payable to LBSF into a significant payable by LBSF.

6

11.    First, in order to terminate the Swaps before LBI entered liquidation proceedings, Giants Stadium quickly had to amend the Indenture to remove its minimum hedging requirement.  In violation of the Indenture and the Agreements, Giants Stadium consciously avoided seeking or obtaining the mandated consent from LBSF to amend the Indenture, even though LBSF's consent expressly was required because the removal of the minimum hedging requirement materially and adversely affected LBSF's rights under the Swaps.

12.    Second, Giants Stadium proceeded to commence the Market Quotation process pursuant to Paragraph 6 of the Confirmations, even though it was relying on the impermissible *ipso facto* clause to do so.  Had the *ipso facto* clause been (appropriately) disregarded, and the Settlement Amounts calculated under Paragraph 5 using a LIBOR-based floating rate, Giants Stadium would have owed LBSF approximately $94 million in Settlement Amounts as of September 18, 2008.  Moreover, in outright breach of the Agreements, Giants Stadium selected three Reference Market-makers and sought quotations from them, without ever obtaining a contractually-required written waiver from LBSF of its rights with respect to the Market Quotation process.

13.    Finally, having determined improperly that Market Quotation failed because no Reference Market-maker was willing to provide quotations, Giants Stadium proceeded to calculate Settlement Amounts under the "Loss" measure set forth in the Agreements.  Operating under the unsupportable assumption that the floating rates paid by LBSF for the next thirty-eight years could be derived from the auction results on the Goldman Bonds during a relatively brief period, and ignoring all of the protections for which LBSF specifically bargained in order to immunize itself from long-term dislocations in the auction rate securities market, Giants Stadium

7

calculated Settlement Amounts of approximately $301 million in its favor based on auctions of the Goldman Bonds and filed claims against the LBSF and LBHI estates in the same amount.

14.    At some point thereafter, Baupost Group, LLC ("Baupost") acquired the Giants Stadium claims against the Lehman estate. Baupost was a large holder of claims in the Lehman bankruptcy, and as a significant participant in the markets for distressed assets and bankruptcy claims, it was acutely aware of how Lehman intended to reserve for claims made in the bankruptcy. Armed with this awareness, Baupost and Giants Stadium devised a plan to ratchet up the pressure on Lehman to settle at an unreasonable level. After Baupost purchased the claims from Giants Stadium, Giants Stadium impermissibly sought to amend its claims to the remarkable amount of approximately $585 million each—exceeding by more than $177 million both the total face value of the Bonds and the total notional amount of the Swaps. Baupost and Giants Stadium knew that its near-doubling of the claims would force the estate to set aside reserves based on the higher amount to the detriment of all creditors. Giants Stadium took this action in bad faith even though such amendment of a Calculation Statement is not permitted by the Agreements, such amendment of proofs of claim is not permitted under the bar date order entered by the Bankruptcy Court, and the purportedly amended amounts it claimed from Lehman absurdly exceeded both the total face value of the underlying Bonds and the total notional amount of the Swaps.

## JURISDICTION AND VENUE

15.    Commencing on September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries, including LBSF, commenced in this Court voluntary cases under chapter 11 of the Bankruptcy Code.

16.    This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 105(a),

8

365(e)(1), 502(b), 541(a), 541(c)(1), and 542(b) of the Bankruptcy Code, and New York law,

which governs the Agreement pursuant to Part 4(h) of the Schedule.

17.   The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

18.   The Court has personal jurisdiction over defendant Giants Stadium because,

among other reasons, Giants Stadium has filed proofs of claim against various Lehman entities in

connection with the dispute at issue in this adversary proceeding and has appeared in the

bankruptcy proceedings in connection with this dispute.

19.   This adversary proceeding constitutes a core proceeding under 28 U.S.C.

§ 157(b)(2).

20.   Venue is proper in this Court under 28 U.S.C. § 1409(a) because LBHI's and

LBSF's bankruptcy cases are pending in this district.

## THE PARTIES

21.   Plaintiff LBHI is a corporation organized and incorporated under the laws of the

state of Delaware, with its former principal business address at 745 Seventh Avenue, New York,

New York 10019, and its current principal business address at 1271 Sixth Avenue, New York,

New York 10020.  LBHI guarantees LBSF's obligations under the Swaps.

22.   Plaintiff LBSF is a corporation organized and incorporated under the laws of the

state of Delaware, with its former principal business address at 745 Seventh Avenue, New York,

New York 10019, and its current principal business address at 1271 Sixth Avenue, New York,

New York 10020.

23.   On December 6, 2011, the Court approved and entered an order confirming the

Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan

Administrator, is authorized to prosecute actions on behalf of the estate of LBSF.

9

24.    Upon information and belief, Giants Stadium is a limited liability company incorporated under the laws of the State of New Jersey in 2005, in connection with the construction of the Stadium.  Giants Stadium's principal place of business is located in New Jersey and it is owned by the Mara and Tisch families—the owners of the New York Giants football club.  The New York Giants and New York Jets football teams play their home games at the Stadium.  Giants Stadium has an ownership interest in 50% of the Stadium; the other half of the Stadium is held by the owners of New York Jets, LLC.

## BACKGROUND FACTS

A.    **The Swaps**

25.    The Swaps were an integral part of a complex, multi-stage project finance transaction for the Stadium that involved many sophisticated parties, including the New York Giants football club, the National Football League (the "NFL"), the Bank of New York, Goldman, Goldman Sachs Capital Markets, L.P. ("Goldman Sachs"), and financial "monoline" insurers Financial Guaranty Insurance Company ("FGIC") and Financial Security Assurance ("FSA," and with FGIC, the "Insurers").  The ARS that Giants Stadium issued to finance the Stadium were split into seven different tranches, known as Series A-1 through A-7.  Lehman underwrote Series A-4 through A-7 of the ARS (i.e., the Bonds) and Goldman underwrote Series A-1 through A-3 (i.e., the Goldman Bonds).  So long as the ARS (as they originally existed) were in auction mode, the interest rates on the ARS were set by monthly auctions.  LBI acted as broker-dealer for the Bonds.  Giants Stadium purchased insurance to cover its principal and interest payments; the Bonds in Series A-4, A-5, and A-6 were insured by FGIC, and the Bonds in Series A-7 were insured by FSA.

26.    The Indenture governing the ARS required that at least 67% of the ARS be hedged for fifteen years following their issuance and that 40% of the ARS remain hedged for the

10

following twenty-five years through their maturity. See Indenture, § 609(nn). Accordingly,

Giants Stadium entered into interest rate swap transactions with both Goldman Sachs and LBSF.

The swap with Goldman Sachs, under which Giants Stadium paid a fixed rate of interest and

Goldman Sachs paid a floating rate based on LIBOR, covered Series A-2 and A-3 of the

Goldman Bonds (the "Goldman Swaps").

27.    Giants Stadium also entered into the two substantively identical Swaps with

LBSF pursuant to the Agreements in order to hedge the Bonds. One of the Swaps covered Series

A-4, A-5, and A-6, while the other covered Series A-7; the two swaps with LBSF had a

combined notional or face value of $408,325,000 (the same principal amount as the Bonds), and

maturity dates of April 1, 2047. Each of the Swaps was documented by a separate and

substantially identical Confirmation dated August 16, 2007, each of which was subject to the

terms of one of the two Master Agreements. (Copies of the Master Agreements and Schedules

thereto are attached hereto as Exhibits A and B; copies of the Confirmations are attached hereto

as Exhibits C and D.)

**B.    The Swaps Provide Critical Protections to LBSF**

28.    Under the Agreements, LBSF agreed to pay Giants Stadium a floating rate based

on the actual interest rate paid on the Bonds as a result of each periodic auction (i.e., the Actual

Bond Rate). In return, Giants Stadium agreed to pay LBSF a fixed interest rate of 6.1885%. By

receiving the Actual Bond Rate, and not a LIBOR-based rate, from LBSF, Giants Stadium

created a hedge by which it would receive a payment stream that would cover its interest note

payments on the Bonds, leaving Giants Stadium with a fixed interest rate payment obligation

regardless of the floating rates it paid on the Bonds as set by the monthly auction.

29.    Although Giants Stadium had the benefit of this actual rate hedge under the

Swaps, such a hedge was not required by the minimum hedging requirements of the Indenture.

11

Indeed, the Goldman Swaps (which had LIBOR-based rates) also were considered hedges for purposes of the Indenture. Thus, whether the Swaps were Actual Bond Rate swaps or LIBOR-based swaps, they would have served the purposes of hedging the ARS under the Indenture.

30.    At the same time, paying the Actual Bond Rate carried more risk for LBSF than paying a floating rate based on LIBOR, particularly because the rate set by auction could vary significantly and might yield a floating rate economically less advantageous to LBSF than a LIBOR-based floating rate.

31.    To protect itself from the risk that paying the Actual Bond Rate created, LBSF bargained for and received a number of critical contractual protections. One important protection was that its affiliate, LBI, was to serve as broker-dealer for the underlying Bonds. This ensured that a Lehman affiliate would have control over the auctions and, in turn, the process by which the Actual Bond Rate was set. It is common for a swap provider of an actual rate swap to insist upon being the broker-dealer in order to manage its risk. Indeed, LBI's role as broker-dealer was essential to LBSF's agreement to act as swap counterparty to Giants Stadium and the Agreements are structured to ensure that LBSF would not be exposed to auction rate risk if LBI was not the broker-dealer.

32.    Thus, a critical contractual protection for LBSF was that if LBI ever ceased to be the broker-dealer, LBSF no longer had to continue paying Giants Stadium the Actual Bond Rate. Accordingly, Paragraph 7 of the Confirmations included a provision that the floating interest rate automatically would switch to a LIBOR-based rate if LBI ever ceased running the auctions. Specifically:

> In the event that LBI is, at any time, **_terminated or replaced_** in its capacity as broker-dealer with respect to Related Bonds that are in Auction Mode and with respect to which the Floating Rate payable by Lehman . . . is the Actual Bond Rate, [Giants Stadium] shall . . .

12

be deemed to have exercised its conversion option [under
Paragraph 7 to convert the floating rate from an Actual Bond Rate
to a LIBOR-based rate] with respect to all of the Related Bonds
that are then in Auction Mode and the Fixed Rate and the Floating
Rate shall thereafter be deemed to have been modified . . . .

See Exs. C and D, ¶ 7 (emphasis added).

33.    If at any time LBI was terminated or replaced as broker-dealer, the floating rate

would be based on LIBOR and not on auction-determined results.  Nothing in the Agreements

limited this protection for LBSF to circumstances in which LBI is terminated as broker-dealer by

Giants Stadium, and the Agreements certainly did not limit such protection in the event LBI was

forced to withdraw as broker-dealer because of its insolvency.

**C.    The Method of Calculating Settlement Amounts under the Swaps**

34.    Under the Agreements, if the Swaps are terminated prior to maturity, whichever

party is in-the-money at the time of termination (regardless of whether that party was the

Defaulting Party) is entitled to receive a Settlement Amount from the other party.  Paragraph 5 of

the Confirmations provides the methodology for calculating a Settlement Amount:

> ***Floating Rate Option for Termination Payments***: Except with
> respect to the circumstances described in Paragraph 6(A) or 6(B)
> below, notwithstanding anything in the Agreement or this
> Confirmation to the contrary, ***if the Floating Rate at the time of
> the early termination of this Transaction is the Actual Bond
> Rate, (a) the Floating Rate shall, for all purposes (including,
> without limitation, the calculation of amounts payable upon such
> termination) be deemed to be USD-LIBOR-BBA (having a
> Designated Maturity of one month) plus 0.3185%***, calculated on
> an Actual/360 basis, with respect to all amounts that would be
> payable after the early termination date if no such termination had
> occurred and (b) the Settlement Amount shall, in all events, be
> determined pursuant to Section 6(e)(ii) as if both parties are
> Affected Parties.

Id. ¶ 5 (emphasis added).  Paragraph 5 requires the parties to apply a LIBOR-based rate in

calculating the Settlement Amounts under the Swaps in virtually all circumstances.  This

13

requirement is consistent with the parties' recognition that any Market Quotation for an Actual

Bond Rate swap could be extremely imprecise, even subjective. Wishing to avoid the risk of

imprecise valuations, the parties instead agreed to value the Swaps as more conventional

LIBOR-based swaps in virtually all circumstances.

35.     Although Paragraph 5 purports to govern the calculation of the Settlement

Amounts in virtually all circumstances, it also contains an exception that is triggered in the event

of a Lehman bankruptcy filing (the "Bankruptcy Trigger"). In such an event, Paragraph 6

provides for a different method of calculation:

> ***Termination Upon Lehman Downgrade or Default***: If, at any
> time that the Floating Rate is the Actual Bond Rate, (A) this
> Transaction is terminated as a result of the occurrence of the
> Additional Termination Event described in Part 1(k) of the
> Schedule or ***(B) this Transaction is terminated as a result of the
> occurrence of an Event of Default with respect to which Lehman
> is the Defaulting Party, the Settlement Amount will be
> determined pursuant to Section 6(e)(ii) of the Agreement*** as if
> Lehman were the sole Affected Party, provided that the Market
> Quotation with respect to this Transaction will be calculated as
> follows:
>
> (a)     Prior to the Early Termination Date, Counterparty and
> Lehman shall each designate two (2) Reference Market-makers
> (each, a "Designated Dealer") . . .
>
> (b)     On the Early Termination Date, Lehman shall solicit
> quotations from the Designated Dealers . . .
>
> (c)     The Market Quotation in connection with the termination
> of this Transaction pursuant to this Paragraph 6 shall be the
> amount of the lowest quotation received . . .

Id. ¶ 6 (emphasis added).

36.     As alleged below, Giants Stadium did not determine the Settlement Amounts for

the Swaps using the methodology set forth in Paragraph 5 of the Confirmations (which would

have yielded Settlement Amounts of approximately $94 million, payable to LBSF). Instead,

14

Giants Stadium relied upon the Bankruptcy Trigger in order to value the Swaps using Paragraph 6(B) of the Confirmations. The Bankruptcy Trigger, however, is an unenforceable *ipso facto* provision under sections 365(e)(1)(B) and/or 541(c)(1)(B) of the Bankruptcy Code because it detrimentally modifies LBSF's rights as a result of a bankruptcy filing.

37.     Apart from *ipso facto* issues, appropriate utilization of the Market Quotation process under Paragraph 6 would have brought into play other protections for which LBSF had specifically bargained and obtained—ones not usually afforded to Defaulting Parties under ISDA Master Agreements.

38.     Market Quotation is one of the two measures provided for in the standard form 1992 ISDA Master Agreement to calculate the Settlement Amount owed to the "in-the-money" party upon the early termination of a swap transaction. As defined therein, Market Quotation typically requires that, upon early termination of a swap, the Non-defaulting Party select four Reference Market-makers and solicit quotations from them for the amount that each would pay or accept as payment to step into the shoes of the Defaulting Party. See Exs. A and B, Master Agreement at § 14 (definitions of "Market Quotation" and "Reference Market-makers"). If all four Reference Market-makers provide quotations, then the Non-defaulting Party calculates the Settlement Amount by omitting the high and low quotations and taking the mean of the two middle quotations. If only three quotations are received, then the Non-defaulting Party must disregard the high and low quotations and use the middle quotation as the basis for calculating the Settlement Amount. If fewer than three quotations are received, however, then Market Quotation is deemed to have failed and the Non-defaulting Party must use the Loss measure to calculate the Settlement Amount.

15

39.    In Paragraph 6 of the Confirmations, however, the parties modified the typical

1992 form ISDA Master Agreement's definition of Market Quotation and agreed upon a

definition that had LBSF—even as the Defaulting Party—select two of the four Reference

Market-makers and conduct the solicitations from all four Reference Market-makers.  By

appointing LBSF as the party running the Market Quotation process under all circumstances, the

parties contractually gave effect to their intent that LBSF—not Giants Stadium—always would

have the right to, among other things, describe the economic terms of the Swaps to Reference

Market-makers for the purpose of valuing the Swaps under Market Quotation and determine if

Market Quotation had failed.  Moreover, by requiring that each party select dealers prior to an

Early Termination Date, the Confirmations imposed the requirement on Giants Stadium that it

either contact LBSF before terminating or allow for sufficient time to elapse between the

delivery of the termination notice and the Early Termination Date for LBSF to exercise its rights

under the contract to identify and then contact Reference Market-makers.  The Confirmations

therefore contemplated that LBSF would be accorded notice and the opportunity to exercise all

of its contractual rights so that it could preserve the Swaps' value to LBSF and limit its exposure

under the Swaps as much as possible.  These rights were designed to prevent precisely the type

of manipulation in which Giants Stadium engaged here.

**D.**    **LBSF's Rights under the Indenture**

40.    LBSF also had bargained for and received certain protections under the Indenture.

The Indenture contains a minimum hedging requirement in section 609(nn).  Removing or

changing the hedging requirements required an amendment of the Indenture, with the result that

Giants Stadium could not cause any early termination of the Swaps without being in default

under the Indenture unless the Indenture was first amended.  Importantly, the Indenture required

16

that LBSF approve any amendment to the Indenture that "materially and adversely" affected its

rights. Specifically:

> StadCo and the Trustee may, without the consent of, or notice to,
> any of the Holders but with notice to each Bond Insurer, each
> Qualified Swap Provider and each Swap Insurer enter into
> Supplemental Indentures as shall not be inconsistent with the terms
> and provisions hereof for any one or more of the following
> purposes . . . *(viii) to make any other changes herein which shall
> not prejudice in any material respect the rights of the Holders of
> the Outstanding Bonds, each Bond Insurer or of any Qualified
> Swap Provider.*

See Ex. E, at § 1101(a)(viii) (emphasis added).

> [N]othing in this Indenture shall permit, or be construed as
> permitting . . . (7) any amendment that materially and adversely
> affects the rights or obligations specific to the Qualified Swap
> Providers as a group or of any Qualified Swap Provider
> individually *without the consent of each affected Qualified Swap
> Provider.*

See id., at § 1102(a)(7) (emphasis added).

      41.    LBSF indisputably was a "Qualified Swap Provider" that had the right to consent

to any Indenture amendment that materially and adversely affected its rights or that prejudiced it

in any material respect.

      42.    The parties also expressly incorporated the minimum hedging requirements into

the Agreements—to which only Giants Stadium and LBSF were parties. Specifically, Part 1(l)(i)

of the Schedules applies to "any transaction" that is insured by a financial guaranty (i.e., FGIC

and FSA) and states as follows:

> Notwithstanding anything to the contrary in Section 6 of this
> Agreement, if any:
>
> (a) Event of Default in respect of any Insured Transaction under
> this Agreement occurs; or
>
> (b) Termination Event . . . in respect of any Insured Transaction
> under this Agreement occurs; then, in either such case, Party A

17

> [LBSF] shall not designate an early Termination Date pursuant to
> Section 6 of this Agreement in respect of any Insured Transaction
> without the prior written consent of the Insurer.  ***Further, Party B
> [Giants Stadium] shall not designate an Early Termination Date
> pursuant to Section 6 of this Agreement in respect of any such
> Insured Transaction if the termination of such Insured
> Transaction (or any part thereof) would violate Section 609(nn)
> or any other provision of the Covered Indenture or any provision
> of the Insurance and Indemnity Agreement.***

See Exs. A and B, Schedules, Part (l)(i) (emphasis added).

43.    Although these provisions were of interest to the Insurers, by including in the

Schedules—*to which the Insurers were not a party*—a provision requiring that the Swaps not be

terminated if doing so would violate the minimum hedging requirement, the parties provided

LBSF with the express right, under sections 1101(a)(viii) and 1102(a)(7) of the Indenture, to

enforce the minimum hedging requirements as a prerequisite to termination.  These rights were

material to LBSF because, among other things, they limited Giants Stadium's ability to terminate

without obtaining replacement hedges or LBSF's consent.

**E.      Lehman Ceases Auctioning the Bonds and Pays the All Hold Rate**

44.    The auction rate securities market essentially collapsed in February 2008, with a

large number of auctions failing.  The deterioration of the market (and the concomitant high

interest rates for auction rate securities) caused LBI to purchase the Bonds, eventually coming to

own 100% of the Bonds that it was responsible for auctioning.  Owning the Bonds meant that,

economically, any payment by LBSF to Giants Stadium ultimately was paid over to LBI as the

fixed interest payment on the Bonds that it held.

45.    Moreover, as the Bonds were "held" rather than auctioned, the floating rate on the

Swaps was calculated using the All Hold Rate, which required that LBSF pay a floating rate of

90% of one-month LIBOR rather than the Actual Bond Rate.  Thus, with respect to the Swaps, as

18

long as the All Hold Rate was in effect, the payments due under the Swaps almost certainly would favor LBSF.

**F.     Giants Stadium Determines to Terminate the Swaps**

46.     In the months leading up to September 2008, LBSF regularly was generating mark-to-market valuations of the Swaps.  In September 2008, mere days before the LBHI bankruptcy filing, at Giants Stadium's request, LBSF sent to Giants Stadium a mark-to-market valuation statement, which reflected a roughly $60 million valuation of the Swaps in LBSF's favor, which valuation Giants Stadium did not dispute.

47.     On September 15, 2008, LBHI filed its chapter 11 petition.  Giants Stadium was concerned that the bankruptcy of LBHI presaged the liquidation of LBI.  Representatives of Giants Stadium had been informed by one or more Lehman employees that LBI likely was to be placed in liquidation on September 19, 2008.  Giants Stadium knew that if LBI were placed into liquidation, it would render LBI ineligible to remain acting as broker-dealer and cause its termination as broker-dealer and certain replacement.  This would trigger the switch in the interest rate to be used under Paragraph 7 of the Confirmations, thereby making LBSF unquestionably the "in-the-money" party as a result of the LIBOR-based floating rate that would take effect.  In an effort to escape that result, Giants Stadium sought to terminate the Swaps in advance of LBI's liquidation.  In so doing, Giants Stadium acted on the mistaken belief that it could "freeze time" and prevent the switch in interest rates and the LIBOR-based floating rate from being used to calculate Settlement Amounts, thereby eradicating a multi-million dollar payment obligation to LBSF.

48.     Specifically, on September 17, 2008, just two days after LBHI's chapter 11 filing, Christine Procops, the New York Giants football club's Chief Financial Officer who also acted as Giants Stadium's "authorized representative," ████████████████████████████████████

US_ACTIVE:\44290157\15\58399.0011



49.    The next day, September 18, 2008, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

50.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**G.    The Indenture Purportedly is Amended**

51.    Giants Stadium could not at that time simply have terminated the Swaps absent an amendment to the Indenture because termination of the Swaps would leave Giants Stadium in violation of the minimum hedging requirement set forth in section 609(nn) of the Indenture. Thus, Giants Stadium first had to find a way to remove the minimum hedging requirement. It attempted to do so by obtaining consent from the Insurers to enter into a Third Supplemental Indenture (the "Supplemental Indenture") that would amend the Indenture by adding the following language to section 609(nn):

> provided, however, that any failure to comply with this Section 609(nn) as a result of the termination of any Qualified Swap with

20

the written consent of each Bond Insurer shall not constitute a
violation of this Section 609(nn).

Giants Stadium performed this end-run around LBSF's protections without seeking or receiving

consent from LBSF to add such language or enter into the Supplemental Indenture.  Because the

Supplemental Indenture materially and adversely affected LBSF's rights under the Swaps,

LBSF's consent was required and the amendment of the Indenture was invalid.

**H.      Giants Stadium's Termination Notices and LBI's Resignation**

        52.      On September 18, 2008, Giants Stadium, in its rush to terminate the Swaps,

delivered notices of termination (the "Termination Notices") to LBSF.  As stated therein, Giants

Stadium sought to terminate the Swaps on the basis of LBHI's bankruptcy, and designated that

same day, September 18, 2008, as the Early Termination Date with respect to the Swaps.

        53.      On September 19, 2008, SIPC commenced an action in the United States District

Court for the Southern District of New York, seeking entry of an order, among other things,

appointing a trustee "for the liquidation of the business of" LBI.  See SIPC v. LBI, Inc., Case No.

08-cv-08119 (BSJ), Docket Entry No. 1, at ¶¶ 6-7.  Later that same day, the Court issued an

order authorizing the SIPC trustee to take immediate possession of LBI's property and to begin

liquidating LBI's business.  See id., Docket Entry No. 2.  As Giants Stadium expected, on that

same day, LBI was forced to resign as broker-dealer for the Bonds.  In January 2009, Goldman,

affiliates of which also served as Giants Stadium's underwriter, swap counterparty, and financial

advisor, replaced LBI as broker-dealer.

**I.      The Calculation Statements**

        54.      On October 2, 2008, Giants Stadium sent Calculation Statements to LBSF

asserting total Settlement Amounts for the two Swaps of $301,025,197.12 payable to Giants

Stadium. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    The Calculation Statements prepared by Giants

Stadium and Goldman also did not properly apply Paragraph 5 of the Confirmations, which

provided that Settlements Amounts would be calculated based on a LIBOR-based interest rate.

55.    Even if Paragraph 5 did not apply, notwithstanding the clear and unambiguous

contractual language that gave LBSF the right to select two of the four Reference Market-makers

and to be the party to solicit quotations from the four Reference Market-makers, Giants Stadium

also breached the Agreements by undertaking those tasks on its own, despite never having

received any form of consent, much less the required written waiver from LBSF of its rights.

56.    In the Calculation Statements, Giants Stadium asserted that "after discussions

with three leading dealers in New York, we have determined that obtaining 'Market Quotations'

for the Transaction is either not practicable or would not lead to a commercially reasonable

result." Under the Agreements, however, Giants Stadium had no right to conduct the Market

Quotation process.

57.    In preparing the Calculation Statements, Giants Stadium and Goldman, acting as

financial advisor, also ignored the fact that if the termination notices had frozen time on

September 18, 2008 (which Giants Stadium apparently tried to do), they would have had to

account for the All Hold Rate that was then in effect. Had Giants Stadium and Goldman used

the All Hold Rate to calculate the termination payment, LBSF would have been in-the-money by

more than $94 million. Instead, in an effort to avoid payment to LBSF, Giants Stadium sought to

project the interest rate on the Bonds over the life of the Swaps (i.e., the next thirty-eight years).

Giants Stadium used the interest rate that had been set in the most recent auction for the

22

Goldman Bonds (which was not conducted by a Lehman affiliate)—in the most tumultuous time

for the auction rate securities market—as a proxy for the interest rate on the Bonds, and absurdly

applied that rate for the next thirty-eight years.  The expedient assumption made by Giants

Stadium that the rates set by the auction on the Goldman Bonds (in a historically dysfunctional

auction rate securities market) would remain intact for the next thirty-eight years is commercially

unreasonable on its face.

58.     Moreover, the valuations also ignored the fact—obvious to any participant in the

international capital markets on September 18, 2008—that (i) LBI would be forced to resign as

broker-dealer and inevitably would be replaced, thus triggering the Swaps' switch to a LIBOR-

based rate instead of an auction rate, and (ii) LBSF or any counterparty stepping into LBSF's

shoes had the unambiguous right to cause Giants Stadium to refinance the Bonds, which would

have limited sharply any payments owed by LBSF under the Swaps—a right that invariably

would have been exercised had the auction rate securities markets continued to be dysfunctional.

59.     Thus, only by applying an invalid *ipso facto* provision and making unrealistic and

unreasonable assumptions about the interest rate payable by LBSF on the Swaps over the next

thirty-eight years (among other flaws) could Giants Stadium demand a payment from LBSF of

$301,025,197.12 in its Calculation Statement.

**J.**     **Giants Stadium Files, and Later Improperly Seeks to Amend, its Proofs of Claim**

60.     On October 17, 2008, Giants Stadium filed in Lehman's chapter 11 proceedings

proofs of claim Nos. 315 and 316 against LBSF and LBHI, respectively, in the amount of

$301,828,087.35 each.

61.     On July 2, 2009, the Court established September 22, 2009 as the general deadline

for filing proofs of claim (the "Bar Date") and October 22, 2009 as the deadline for completing

23

electronic questionnaires for claims based on derivatives contracts and guarantees and uploading supporting documentation and evidence of underlying claim amounts.

62.     On September 22, 2009, Giants Stadium filed proofs of claim Nos. 33561 and 33562 against LBHI and LBSF, respectively, again in the amount of $301,828,087.35 each. Giants Stadium also submitted a response to the "Derivative Questionnaire" required by the Bankruptcy Court, in which Giants Stadium asserted claims against the LBSF estate in the same amount.

63.     On October 22, 2009, Giants Stadium submitted responses to the Derivative Questionnaire and the "Guarantee Questionnaire" required by the Bankruptcy Court, in which Giants Stadium asserted claims against LBSF and LBHI, respectively, in the amount of $301,804,617.14 each—reflecting the same principal amount set forth in the Calculation Statements prepared by Goldman (as Giants Stadium's financial advisor) and amending the interest amount owed under each Swap.

64.     On October 29, 2009, Giants Stadium filed proofs of claim Nos. 64070 and 64071 (the "Proofs of Claim") in the amount of $301,804,617.14 each. The Proofs of Claim superseded Claim Nos. 33561 and 33562.

65.     In July 2010, Giants Stadium refinanced the Bonds.

66.     On December 6, 2011—around the same time that the parties had agreed to attempt mediation and more than three years after having served the Calculation Statements in which it claimed a total payment of approximately $301 million from LBSF—Giants Stadium filed new proofs of claim, which purported to amend the Proofs of Claim (the "New Proofs of Claim"). The New Proofs of Claim (Claim Nos. 67782 and 68103) nearly doubled the amounts Giants Stadium originally sought to approximately $585 million each. Giants Stadium also

24

purported to amend its Derivative Questionnaire and Guarantee Questionnaire. Putting aside that the New Proofs of Claim provide calculations completely inconsistent with Giants Stadium's earlier "Loss" calculations, are improper under the plain terms of the ISDA Master Agreement, and are precluded by the Bar Date set by the Bankruptcy Court (and the specific process for asserting claims based on derivatives contracts and guarantees), these proofs of claim were filed in bad faith as a negotiating tactic to force Lehman to increase its reserves with respect to these inflated claims, thereby reducing the amounts that could be paid out to creditors, in an effort to pressure the estate to settle in a manner inequitable to its many legitimate creditors.

## COUNT I

**(Breach of the Agreements Based on Giants Stadium's Calculation of the Settlement Amounts under an Impermissible *Ipso Facto* Clause)**

67.    Lehman repeats, realleges, and incorporates by reference the allegations contained in Paragraphs 1-66 of this Complaint as though fully set forth in this cause of action.

68.    Paragraph 5 of the Confirmations provides that the floating rate for the purpose of calculating Settlement Amounts is LIBOR plus 0.3185%, unless termination is triggered by, among other things, the bankruptcy of Lehman, in which case the Settlement Amount is calculated using a modified Market Quotation measure as set forth in Paragraph 6. Giants Stadium terminated the Swaps as a result of a Lehman bankruptcy, which, on the face of the Confirmations, directed it to calculate the Settlement Amounts under Paragraph 6. This modification of LBSF's contractual rights based on a bankruptcy filing is invalid under sections 365(e)(1) and 541(c)(1) of the Bankruptcy Code, as well as common law and equitable principles.

69.    If the Settlement Amounts had been calculated under Paragraph 5 using a LIBOR-based floating rate, LBSF would be owed approximately $94 million by Giants Stadium, plus

US_ACTIVE:\44290157\15\58399.0011

interest.  By relying on the Bankruptcy Trigger, however, Giants Stadium calculated Settlement

Amounts in its own favor.  Thus, the modification of LBSF's rights is obvious and significant.

70.    By relying on an impermissible *ipso facto* clause to calculate the Settlement

Amounts for the Swaps, Giants Stadium breached the Agreements.  As a result of such breach,

LBSF has been damaged in an amount to be proven at trial, but no less than $94 million, an

amount representing the proper calculation of the Settlement Amounts under Paragraph 5 of the

Confirmations, plus interest.

## COUNT II

**(Breach of the Agreements Based on Giants Stadium's Failure to Properly Calculate
Settlement Amounts Even If the Bankruptcy Trigger is not an *Ipso Facto* Clause)**

71.    Lehman repeats, realleges, and incorporates by reference the allegations contained

in paragraphs 1-66 and 68-70 of this Complaint as though fully set forth in this cause of action.

72.    Even if the Bankruptcy Trigger is not an impermissible *ipso facto* clause and

Giants Stadium was entitled to calculate the Settlement Amounts using the methodology set forth

in Paragraph 6, Giants Stadium still breached the Agreements and damaged LBSF by calculating

the Settlement Amounts without regard to the impact of Paragraph 7 on the value of the Swaps.

73.    Specifically, the language of the Paragraph 7 states that "[i]n the event that LBI is,

at any time, **terminated or replaced** in its capacity as broker dealer . . . Counterparty shall,

immediately and without further action by any party, be deemed to have exercised" its option to

convert the floating rate from the Actual Bond Rate to a LIBOR-based rate.  This language is

unambiguous; in any situation where LBI is terminated or replaced, the floating rate switches to

a LIBOR-based rate.

74.    As evidenced by the provisions throughout the Agreements that protect LBSF

from exposure to auction rate risk, protecting LBSF from exposure to the Actual Bond Rate was

26

a material economic term of the Swaps. Moreover, as alleged above, emails among Giants Stadium, its advisors, and the Insurers show that Giants Stadium knew that if LBI was no longer the broker-dealer, Paragraph 7 would be triggered and the floating rate would switch to a LIBOR-based rate. Thus, Giants Stadium (wrongly) believed it to be imperative to terminate the Swaps prior to the commencement of LBI's liquidation proceeding so as to transform what would otherwise be a claim by LBSF against Giants Stadium into a claim by Giants Stadium against LBSF.

75.     "Loss" is defined as "an amount [the Non-defaulting Party] reasonably determines in good faith to be its total losses and costs (or gain. . .)" incurred in connection with the terminated transactions.

76.     In order to determine its "total losses and costs (or gain. . .)" resulting from the termination of the Swaps, Giants Stadium should have valued the Swaps as if LBI would (at some point soon after termination) no longer be the broker-dealer. Instead, when Giants Stadium performed that calculation, it ignored Paragraph 7 and wrongly assumed that LBSF would continue paying an Actual Bond Rate through maturity, even though it knew that LBI would be terminated or replaced as broker-dealer shortly after LBHI's bankruptcy filing. Indeed, by the time Giants Stadium served its Calculation Statement on October 2, 2008, LBI already had ceased being the broker-dealer for the Bonds on September 19, 2008, when its resignation as broker-dealer was compelled by SIPC's commencement of a liquidation action against LBI. Thus, in calculating the Settlement Amounts under Loss, Giants Stadium was required to make reasonable assumptions that necessarily included giving effect to the Paragraph 7. Had Giants Stadium done so, it would have calculated a Settlement Amount in favor of LBSF.

27

77.     Moreover, if the termination of the Swaps prior to LBI's resignation as broker-dealer essentially "froze" the status quo by preventing Paragraph 7 from taking effect for the purpose of calculating the Settlement Amounts—as Giants Stadium clearly intended—then Giants Stadium should have truly frozen the state of the Swaps at the time of the bankruptcy by using the All Hold Rate to calculate the Settlement Amounts because that was the rate then in effect at the time of termination.  Giants Stadium did not use the All Hold Rate or the appropriate LIBOR-based rate, however, opting instead to make commercially unreasonable assumptions in order to thwart LBSF's contractual rights and deny LBSF's creditors the value of the Swaps.

78.     By calculating the Settlement Amounts for the Swaps without taking Paragraph 7 into account, Giants Stadium improperly applied the Loss measure and thereby breached the Agreements.  As a result of such breach, LBSF has been damaged in an amount to be proven at trial, but no less than $94 million, an amount representing the proper calculation of the Settlement Amounts, plus interest.

## COUNT III

### (Breach of the Agreements Based on Giants Stadium's Failure to Adhere to the Market Quotation Mechanism in the Agreements)

79.     Lehman repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-66, 68-70, and 72-78 of this Complaint as though fully set forth in this cause of action.

80.     Even if the Bankruptcy Trigger is not an impermissible *ipso facto* clause and Giants Stadium was entitled to calculate the Settlement Amounts using the methodology set forth in Paragraph 6, Giants Stadium still breached the Agreements and damaged LBSF by usurping LBSF's right to conduct the Market Quotation process and LBSF's right to select two of the four Reference Market-makers.

28

81.     Giants Stadium and LBSF agreed that rather than follow the Market Quotation process as set forth in the standard 1992 form ISDA Master Agreement, LBSF—even if it was the Defaulting Party—would have the right to select two of the four Reference Market-makers and conduct the Market Quotation process. This provision was of material benefit to LBSF, because, among other things, as the party soliciting quotations from the Reference Market-makers, it gained the right to explain the material economic terms of the Swaps to Reference Market-makers—which, in this case, would have allowed LBSF to point out its rights with respect to LBI's forced resignation as broker-dealer and inevitable replacement. Had Giants Stadium adhered to the terms of the Agreements, it likely would not have been able to terminate until after LBI had been forced to resign as broker-dealer, a result that Giants Stadium itself understood would cause the Swaps to be in-the-money to LBSF.

82.     Following its termination of the Swaps, Giants Stadium usurped LBSF's right to conduct the Market Quotation process. Despite the clear and unambiguous language in the Confirmations granting LBSF the exclusive right to perform those tasks, Giants Stadium undertook those tasks on its own, without ever obtaining a written waiver from LBSF of its rights under the contracts. Thus, Giants Stadium materially breached the Agreements.

83.     LBSF has been damaged by Giants Stadium's breach in an amount to be proven at trial, but no less than $94 million, an amount representing the proper valuation of the Swaps, plus interest.

29

## COUNT IV

### (Breach of the Agreements Based on Giants Stadium's
### Termination of the Swaps in Violation of the Minimum Hedging Requirement)

84.    Lehman repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-66, 68-70, 72-78, and 80-83 of this Complaint as though fully set forth in this cause of action.

85.    Giants Stadium breached the Agreements and damaged LBSF by terminating the Swaps without satisfying the condition in the Agreements prohibiting the swaps' termination where the effect of termination would leave more than 33% of the ARS unhedged.

86.    Sections 1101(a)(viii) and 1102(a)(vii) of the Indenture provide that any amendment to the Indenture that materially prejudices a Qualified Swap Provider or materially affects the rights or obligations of a Qualified Swap Provider is not permitted unless the Qualified Swap Provider consents.

87.    The Supplemental Indenture, which was executed by Giants Stadium without LBSF's knowledge or consent, attempted to remove the minimum hedging requirement from the Indenture so that Giants Stadium would be able to terminate the Swaps without violating the Indenture.

88.    Part 1(l)(i) of the Schedules between LBSF and Giant Stadium, states that Giants Stadium cannot declare an Early Termination Date if doing so would violate the minimum hedging requirement set forth in section 609(nn) of the Indenture. Thus, any removal of the minimum hedging requirement absent LBSF's consent materially and adversely affected LBSF because LBSF had the right not to have the Swaps terminated if doing so would violate the minimum hedging requirement. By failing to obtain LBSF's consent to amend the Indenture, the Supplemental Indenture is invalid and Giants Stadium had no right under Part 1(l)(i) of the

30

Schedules to terminate the Swaps. Thus, Giants Stadium's termination of the Swaps was in breach of the Agreements.

89.     This breach caused damage to LBSF. Not only did the termination of the Swaps enable Giants Stadium to seek approximately $585 million from LBSF's and LBHI's respective bankruptcy estates, but the termination also deprived LBSF of the right to continue acting as swap counterparty to Giants Stadium after LBI's termination or replacement as broker-dealer, by which LBSF would have paid a LIBOR-based floating rate to Giants Stadium while receiving a significantly higher fixed rate from Giants Stadium. Indeed, given LIBOR rates since September 2008, the Swaps were very valuable to LBSF.

90.     As a result of such breach, LBSF has been damaged in an amount to be proven at trial.

## COUNT V

### (Breach of the Indenture)

91.     Lehman repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-66, 68-70, 72-78, 80-83, and 85-90 of this Complaint as though fully set forth in this cause of action.

92.     Giants Stadium breached the Indenture and damaged LBSF by amending the Indenture to amend the minimum hedging requirement without LBSF's consent.

93.     As a "Qualified Swap Provider," LBSF is an "Interested Party" under the Indenture expressly permitted to enforce its rights thereunder.

94.     As a result of such breach, LBSF has been damaged in an amount to be proven at trial.

31

## COUNT VI

### (Turnover of the Properly-Calculated Settlement Amount
### Pursuant to Section 542(b) of the Bankruptcy Code)

95.     Lehman repeats, realleges, and incorporates by reference the allegations contained

in paragraphs 1-66, 68-70, 72-78, 80-83, 85-90, and 92-94 of this Complaint as though fully set

forth in this cause of action.

96.     Section 542(b) of the Bankruptcy Code expressly provides that ". . . an entity that

owes a debt that is property of the estate and that is matured, payable on demand, or payable on

order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt

may be offset under section 553 of this title against a claim against the debtor." 11 U.S.C. §

542(b).  As fully alleged above, Giants Stadium was obligated to pay LBSF the properly

calculated Settlement Amounts, plus interest; its failure to do so made the amount still due and

owing a matured debt.

97.     If Giants Stadium properly had calculated the Settlement Amounts, the amount

due and owing to LBSF from Giants Stadium as of September 17, 2008, the Early Termination

Date, would be property of LBSF's estate under section 541(a) of the Bankruptcy Code.

98.     Accordingly, pursuant to section 542(b) of the Bankruptcy Code, Lehman

requests an order compelling and directing Giants Stadium to turn over the properly-calculated

Settlement Amount to LBSF as it constitutes property of the bankruptcy estate under section

541(a) of the Bankruptcy Code.

### PRAYER FOR RELIEF

WHEREFORE, LBHI, in its capacity as Plan Administrator, and LBSF respectfully

request that judgment entered as follows:

US_ACTIVE:\44290157\15\58399.0011

A.      As to Counts I and II, awarding LBSF damages in an amount to be determined at trial, but in all events, no less than $94 million, an amount representing the proper calculation of the Settlement Amounts assuming application of a LIBOR-based rate, plus interest;

B.      As to Count III, awarding LBSF damages in an amount to be determined at trial, but in all events, no less than $94 million, plus interest;

C.      As to Count IV, awarding LBSF damages in an amount to be determined at trial, plus interest;

D.      As to Count V, awarding LBSF damages in an amount to be determined at trial, plus interest;

E.      As to Count VI, a judgment that the properly-calculated Settlement Amount is property of the LBSF bankruptcy estate under section 541 of the Bankruptcy Code and requiring Giants Stadium to turn over, under section 542 of the Bankruptcy Code, the principal amount of such receivable to be determined at trial;

F.      Pre-judgment and post-judgment interest; and

G.      For such other and further relief, including interest, costs, and attorneys' fees, as the Court deems just and proper.

US_ACTIVE:\44290157\15\58399.0011

Dated:  October 23, 2013
New York, New York

By: _____
Richard W. Slack
Robert J. Lemons
Lauren Hoelzer Helenek

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.*

34